UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

**RUSSELL TARDO, ET AL**                                    CIVIL ACTION

**versus**                                                  No. 08-1165

**STATE FARM FIRE AND CASUALTY COMPANY**                    SECTION: "I"/1

## ORDER AND REASONS

Before the Court is a motion to exclude the testimony of plaintiffs' purported expert, Kenneth Savage, filed by defendant, State Farm Fire and Casualty Company ("State Farm"). For the following reasons, the motion is **GRANTED**.

## BACKGROUND

On August 28, 2007, plaintiffs, Russell and Diane Tardo, filed this lawsuit against State Farm, alleging that State Farm owes them additional payments for wind-related damage to their Chalmette, Louisiana property as a result of Hurricane Katrina.[1][2]

State Farm's adjusters conducted two inspections of plaintiffs' property, which consists of two rental units, in October, 2005 and November, 2005. State Farm then paid plaintiffs

---

[1] Plaintiffs named five insurers as defendants in the original complaint, which was filed in Louisiana state court. Rec. Doc. No. 1-2. The matter was removed to this Court in October, 2007. *Id.* Following the Court's order severing plaintiffs' claims against each insurer, plaintiffs filed an amended complaint against State Farm in February, 2008. Rec. Doc. No. 1.

[2] Rec. Doc. No. 1, para. I; Rec. Doc. No. 46-15, para. 1; Rec. Doc. No. 49-2, para. 1.

1

$24,141.41 for dwelling damage to the upstairs rental unit.[3] State Farm denied coverage for the downstairs rental unit based on its determination that the damage was caused by flood, an excluded peril under the policy.[4]

Plaintiffs' proposed expert, Kenneth Savage ("Savage"), visited the property in July, 2008 and subsequently prepared three damage estimates. The first estimate of $139,477.99, which Savage prepared on July 3, 2008, includes all hurricane-related damage to the property.[5] The second estimate of $57,328.27, which Savage prepared on February 26, 2009, only includes damage that Savage concludes was caused by wind.[6] Savage modified his wind-only estimate on April 27, 2009, concluding that wind damage totals $65,190.32.[7]

Because the property had been repaired by the time that Savage visited it, he based his estimate on his interview with Russell Tardo ("Tardo"). State Farm has moved to exclude Savage's testimony on the grounds that he is unqualified, his methodology

---

[3] Rec. Doc. No. 46-15, 2; Rec. Doc. No. 49-2, para. 2. State Farm identified damage totaling an actual cash value of $25,141.41 and then subtracted the policy's $1,000 deductible.

[4] *Id.* at para. 4.

[5] Rec. Doc. No. 39-5.

[6] Rec. Doc. No. 39-6.

[7] Rec. Doc. No. 39-7. Savage's third estimate included items damaged by a kitchen fire. The parties, however, agree that the kitchen fire occurred before Hurricane Katrina and that State Farm adjusted that claim separately. Rec. Doc. No. 46-15, para. 15; Rec. Doc. No. 49-2, para. 15.

is unreliable, and his post-repair estimate is irrelevant.

## LAW AND ANALYSIS

### I. STANDARD OF LAW

Rule 702 of the Federal Rules of Evidence governs the admissibility of expert witness testimony. Fed. R. Evid. 702; *see Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 588, 113 S. Ct. 2786, 2794, 125 L. Ed. 2d 469, 480 (1993); *United States v. Hitt*, 473 F.3d 146, 148 (5th Cir. 2006). Rule 702 provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

The United States Supreme Court's decision in *Daubert* "provides the analytical framework for determining whether expert testimony is admissible under Rule 702." *Pipitone v. Biomatrix, Inc.*, 288 F.3d 239, 243 (5th Cir. 2002). Both scientific and nonscientific expert testimony is subject to the *Daubert* framework, which requires trial courts to make a preliminary assessment to "determine whether the expert testimony is both reliable and relevant." *Burleson v. Tex. Dep't of Criminal Justice*, 393 F.3d 577, 584 (5th Cir. 2004); *see Kumho Tire Co., Ltd. v. Carmichael*,

526 U.S. 137, 147, 119 S. Ct. 1167, 1174, 143 L. Ed. 2d 238, 249-50 (1999).  The burden is on the proponent to prove by a preponderance of the evidence that the expert satisfies the Rule 702 test.  *Mathis v. Exxon Corp.*, 302 F.3d 448, 459-60 (5th Cir. 2002).

A number of nonexclusive factors may be relevant to the reliability inquiry, including:  (1) whether the technique has been or can be tested, (2) whether the technique has been subjected to peer review and publication, (3) the potential error rate, (4) the existence and maintenance of standards controlling the technique's operation, and (5) whether the technique is generally accepted in the relevant scientific community.  *Burleson*, 393 F.3d at 584.  The reliability inquiry must remain flexible, however, as "not every *Daubert* factor will be applicable in every situation; and a court has discretion to consider other factors it deems relevant."  *Guy v. Crown Equip. Corp.*, 394 F.3d 320, 325 (5th Cir. 2004); *see Runnels v. Tex. Children's Hosp. Select Plan*, 167 Fed. App'x 377, 381 (5th Cir. 2006) ("[A] trial judge has 'considerable leeway' in determining '*how* to test an expert's reliability.'" (*citing Kumho Tire*, 526 U.S. at 152, 119 S. Ct. at 1176, 143 L. Ed. 2d at 253)).  "Both the determination of reliability itself and the factors taken into account are left to the discretion of the district court consistent with its gatekeeping function under [Rule] 702."

*Munoz v. Orr*, 200 F.3d 291, 301 (5th Cir. 2000). The purpose of this analysis "is to make certain that an expert, whether basing testimony upon professional studies or personal experiences, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire*, 526 U.S. at 152, 119 S. Ct. at 1176, 143 L. Ed. 2d at 253.

With respect to determining the relevancy of an expert's testimony pursuant to Rule 702 and *Daubert*, the proposed testimony must be relevant "not simply in the sense that all testimony must be relevant [pursuant to Rule 402], but also in the sense that the expert's proposed opinion would assist the trier of fact to understand or determine a fact in issue." *Bocanegra v. Vicmar Servs., Inc.*, 320 F.3d 581, 584 (5th Cir. 2003). "'There is no more certain test for determining when experts may be used than the common sense inquiry whether the untrained layman would be qualified to determine intelligently and to the best degree the particular issue without enlightenment from those having a specialized understanding of the subject involved in the dispute.'" *Vogler v. Blackmore*, 352 F.3d 150, 156 n.5 (5th Cir. 2003) (*quoting* Fed. R. Evid. 702 advisory committee's note).

## II. **DISCUSSION**

Savage inspected plaintiffs' property in July, 2008, nearly

three years after Hurricane Katrina. Savage admits that at the time that he visited the property, the damage had been repaired.[8] Savage did not review photographs of the property taken before the repairs were completed.[9] Nor did Savage take into account plaintiffs' repair receipts when preparing his estimates.[10] Instead, Savage relied entirely on his interview with Tardo.[11] At his deposition, Savage described his line of questioning as

---

[8]Rec. Doc. No. 39-4, pp. 36, 47.

[9]*Id.* at pp. 64, 67.

[10]*Id.* at p. 53. Savage later reviewed plaintiffs' receipts, but he did not use them when calculating his estimates. Instead, he testified that the Hurricane Legal Center asked him to review the receipts and determine which were attributable to wind, although that is not his normal procedure. *Id.* at p. 82-83. Plaintiffs' counsel submitted Savage's "breakdown of the receipts" to State Farm on May 5, 2009, following a request by the U.S. Magistrate Judge. Rec. Doc. No. 58-2.

[11]In his deposition, Savage testified:
> Q. How are you able to accurately estimate what damages would cost to repair if you can't visibly see those damages and they've already been repaired?
> A. Sir, I have to rely on the testimony of the homeowners describing to me what the damages were like. In this case, that's what would've had to have happened.
> Q. So your estimate in Mr. Tardo's case, in this case, is based upon what Mr. Tardo told you about the damages?
> A. That's right. If I can't see it, I have to rely on him.
> Rec. Doc. No. 39-4, pp. 37-38.
> ...
> A. No, I told you I met there with Mr. Tardo. If the property was already repaired, I would have relied on his testimony. Except for, of course, the measurements. I can measure the building. But again, as to what the damages were, I had to rely on what Mr. Tardo said.
> Q. Did you do that in this case?
> A. Yeah.
> Q. Now, I just want to – just for the record, you said you relied on Mr. Tardo's testimony. But when you interviewed him on July 3, '08, he wasn't under oath to give testimony, he was just face to face with you in the middle of Chalmette, right?
> A. Yeah.
> *Id.* at pp. 39-40.

6

follows:

> I would have asked him, Where is the flood line?
> Describe for me the damage in this room. Describe for
> me – walk me through each room. Where was it damaged?
> What did it look like? What did you see when you came
> back? What did the roof look like? Were windows broken?
> I would just ask him as much as I possibly could.[12]

The Court is not persuaded that Savage's interview with Tardo, by itself, is a reliable method for estimating the damage that plaintiffs' property sustained nearly three years earlier.

Savage's estimates are quite detailed. The estimates include specific amounts of drywall, ceiling, and flooring that had to be removed and replaced in each room as well as specific measurements of wall and ceiling that had to be painted. In certain rooms and hallways, his estimates specify the amount of anti-microbial agent that had to be applied. Yet, Savage testified in his deposition that what was repaired, the manner in which repairs were made, the materials involved in the repairs, and how much the repairs cost, were inconsequential to him. Savage testified:

> Q. Wouldn't you agree that your estimate of damages to
> a unit that's already been repaired and occupied at the
> time of your inspection really just renders your
> estimate speculative?
> A. My estimate would have been what were the damages to
> the property at that time. What he spent on repairing
> those damages is – varies on many things. I have no
> idea who did the repairs. I don't know what kind of
> materials he used to make the repairs. Whether he
> changed – what he repaired according to the estimate or

---

[12] *Id.* at p. 38.

not. I don't know. That doesn't matter to me when I'm
writing the estimate. It makes no difference.[13]

Also troubling is the fact that Tardo does not recall whether he had any conversations with Savage, let alone what he told Savage about the damage to his property.[14] Moreover, Savage does not remember whether he documented his full conversation with Tardo. Savage has been unable to produce all of his notes reflecting his interview with Tardo.[15]

The unreliability of Savage's method is confirmed by his admitted mistakes. Savage testified that he was able to reach his conclusion as to the majority of the damage to the property's second floor based on Tardo's statements that the siding had ripped off and that windows were damaged.[16] However, upon his review of pre-repair photographs at his deposition, Savage admitted, "after my conversation with [Tardo], I thought the damage was worse than it appears to be."[17] Savage acknowledged several areas of siding that were not damaged, leading him to concede that damage to the siding was less severe than he was

---

[13]*Id.* at p. 37. Savage states in a declaration that there are computer programs to price the scope of loss based on prices for labor and materials in a particular area. Rec. Doc. No. 48-2, p. 7, para. 11.

[14]Rec. Doc. No. 39-9, p. 3.

[15]Rec. Doc. No. 39-4, pp. 41-47.

[16]*Id.* at pp. 56-57, 67 ("He told me there was significant damage to siding on one side.").

[17]*Id.* at p. 69.

told.[18] He also admitted that the pre-repair photographs show no evidence of a broken window.[19] In light of his review of the less significant damage, Savage conceded that his estimates for items, such as the siding, the insulation, and the builder board that lies beneath the siding, should be lower.[20] Savage further testified, "I would say honestly that the damage to the second floor could be somewhat less than what I have estimated based on what Mr. Tardo told me."[21]

When Savage reviewed State Farm's estimate before preparing his third estimate, he noticed that his prior estimates missed approximately $8,000 in damage. Following his comparison, Savage added those items into his third estimate.[22]

---

[18]Savage reviewed photographs taken by State Farm about a month after the hurricane. Savage testified that the photographs show that several areas of siding were not damaged. *Id.* at pp. 64-67, 71 ("Q. Now, taking that all together, you agree that the siding damage is severely less than what Mr. Tardo led you to believe, correct? A. I would agree with that.").

[19]*Id.* at p. 71.

[20]*Id.* at pp. 68-71.

[21]*Id.* at p. 72.

[22]Savage testified as follows:
> Also, they provided me with information that I had not seen before, like the State Farm estimate, and I looked at the State Farm estimate and noticed there were items in the State Farm estimate that I didn't have on my estimate, so we added those in...
> Q. So it appears that the State Farm estimate, the wind estimate actually has about $8,000 of wind-related damage that you didn't have at all on your February 26th wind damage estimate?
> I believe so. I believe so. That may have been because they were able to see it after the storm and I wasn't. I don't know why, but I did add it in.

*Id.* at p. 52.
In attempting to justify his opinion that the second story's floors

The Court is not satisfied that Savage's method for estimating damage is in any way reliable. The inconsistencies between the damage he claims that plaintiffs described and the damage evident in pre-repair photographs demonstrate that his estimates are not "based upon sufficient facts or data." Fed. R. Evid. 702. From his conversations alone, Savage prepared detailed estimates, leaving too great of an "analytical gap between the data and the opinion proffered." *See Moore v. Ashland Chem. Inc.*, 151 F.3d 269, 277 (5th Cir. 1998). Moreover, plaintiffs have failed to satisfy their burden of demonstrating that Savage's method of arriving at his estimate is reliable.[23] Accordingly, Savage's opinion does not fulfill the requirements of Rule 702.

For the foregoing reasons,

**IT IS ORDERED** that State Farm's motion to exclude is **GRANTED**

---

needed to be replaced, Savage referred to the State Farm estimate. He testified that State Farm had paid to have the property's flooring cleaned rather than replaced. He did not know, however, that State Farm paid to have the floor cleaned because authorities had tracked in mud. Nor could he remember what Tardo had told him about the condition of the floor–whether it had been damaged by wind and rain or soiled by traffic. *Id.* at 77-78.

[23]Plaintiffs sole argument with respect to the reliability of Savage's methods is as follows:
> It is not legally required that Mr. Savage must have seen the actual damage before making his estimate. He received a copy of the State Farm's Claim File and he also interviewed the homeowner regarding the damage that occurred.

Rec. Doc. No. 48, p. 6.

The Court does not conclude that an adjuster must inspect the property immediately after the loss or before the property is repaired. However, for the reasons assigned, Savage's estimates are rejected. The Court has never been confronted with expert estimates as lacking in reliability as the estimates presented in this case.

and that Savage shall not testify at trial as an expert witness.[24]

New Orleans, Louisiana, June 19th, 2009.

_____
**LANCE M. AFRICK
UNITED STATES DISTRICT JUDGE**

---

[24]In light of the Court's ruling that Savage's methods are unreliable, the Court need not reach State Farm's arguments that Savage is unqualified and that his estimates are irrelevant.